No. 93-440

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

ROBERT ALLEN ROMO, CONNIE ROMO,
and TOM ROMO,

      Petitioners and Appellants,

   v.

TARA DAWN HICKOK, LATOYA PATRICIA
HICKOK, by and through their natural
guardian, PATRICIA HICKOK,

      Respondents and Respondents.

FILED

MAR 28 1994

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:  District Court of the Fifteenth Judicial District,
                In and for the County of Roosevelt,
                The Honorable M. James Sorte, Judge presiding.

COUNSEL OF RECORD:

      For Appellants:

           Mary L. Zemyan, Attorney at Law,
           Wolf Point, Montana

      For Respondents:

           Carol C. Johns, Attorney at Law,
           Wolf Point, Montana (for Tara Dawn Hickok)

           Laura Christoffersen, Attorney at Law,
           Wolf Point, Montana (for Patricia Hickok)

Submitted on Briefs:  February 24, 1994

Decided:  March 28, 1994

Filed:

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

Robert Allen Romo petitioned the District Court for the Fifteenth Judicial District in Roosevelt County to establish paternity, custody, and visitation rights for LaToya Patricia Hickok, a minor child. Tom Romo and Connie Romo joined in the petition to obtain rights of visitation. The Romos appeal from that portion of the District Court order awarding visitation to the grandparents and awarding supervised visitation to the father after his release from the Montana State Prison. We affirm the District Court.

The following issues are presented for our review:

1.    Did the District Court err when it found that visitation at the prison was not in the child's best interest?

2.    Did the District Court abuse its discretion when it ordered that, after his release from prison, the father's visitation will be supervised by maternal relatives?

3.    Did the District Court err when it did not set a visitation schedule for the father after his release from prison, but merely provided that visitation would be permitted?

4.    Did the District Court err by giving the mother absolute control over visitation by the paternal grandparents?

### FACTUAL BACKGROUND

LaToya Patricia Hickok was born on February 24, 1991. Her parents, Tara Dawn Hickok and Robert Allen Romo have not married each other. On October 18, 1991, Robert was sentenced to ten years

2

at the Montana State Prison, with seven years suspended, for two counts of burglary and one count of theft.

On April 9, 1992, Robert filed a petition to establish paternity, custody, and visitation rights as LaToya's father. Tom Romo and Connie Romo, Robert's parents, joined him in his petition to obtain the right of visitation as LaToya's grandparents.

After undergoing blood tests, the parties stipulated that Robert was the child's natural father. On November 20, 1992, the District Court appointed Pam Hodges of the Department of Family Services guardian ad litem for the minor child, and further ordered that mental health evaluations and home studies be performed on Tara Hickok, Connie Romo, Tom Romo, and to the extent possible, on Robert Romo.

The District Court held a hearing on June 7, 1993, on the remaining issues of custody and visitation. The District Court's July 2, 1993, order granted sole custody of LaToya to her mother, which the Romos do not contest. The District Court ordered that LaToya not be required to visit her father at the Montana State Prison, but granted him supervised visitation after his release. With regard to Tom and Connie, the District Court recognized their right to visit their granddaughter, and in its order set forth the general parameters under which they could exercise that right.

## ISSUE 1

Did the District Court err when it found that visitation at the prison was not in the child's best interest?

3

The standard of review for custody and visitation is whether substantial, credible evidence supports the district court's judgment. *In re Marriage of Nash* (1992), 254 Mont. 231, 234, 836 P.2d 598, 600.

The Romos argue that, before it could deny visitation with Robert at the prison, the District Court was required, on the basis of § 40-4-217(1), MCA, to find that such visitation would endanger LaToya. That section provides as follows:

> A parent not granted custody of the child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would endanger seriously the child's physical, mental, moral, or emotional health.

This Court recently stated in *In re Marriage of Reininghaus* (1991), 250 Mont. 86, 90, 817 P.2d 1159, 1161; *cert. denied* (1992), 112 S. Ct. 1497, 117 L. Ed. 2d 637, that:

> Although § 40-4-217(1), MCA, requires a showing of endangerment [before the district court can place a restriction on visitation], we will not so narrowly interpret the statute so that the court is unable to design visitation that reflects the child's best interests.

The Commissioners' Note to § 40-4-217, MCA, states that with two important exceptions, the general rule to be applied in awarding visitation is the "best interest of the child" standard. It is only when the court deprives the noncustodial parent of all visitation, or when a custodial parent tries to restrict or eliminate a noncustodial parent's visitation, that the judge must

4

hold a hearing and make the extraordinary finding of serious endangerment.

On July 2, 1993, when the District Court made its findings, Robert's tentative release date from prison was September 1993. Considering the brief amount of time this provision of the District Court order would have an effect, we do not find that Robert was deprived of visitation. Therefore, we will apply the "best interest" standard.

At the time of the hearing, LaToya was approximately two and one-half years old. The distance from Wolf Point to Deer Lodge is approximately 469 miles. Connie Romo testified that the trip to the Montana State Prison in Deer Lodge would involve a five-hour flight in a chartered plane piloted by Tom Romo. Tara testified that she felt the prison environment would confuse and scare her young daughter.

Based on the young age of the child, the long distance involved, the environment in which visitation would take place, and the short time necessary for postponement, we conclude that there was substantial evidence to support the District Court's finding that visitation at the Montana State Prison was not in the child's best interest. Under the circumstances of this case, we hold that "reasonable visitation" does not preclude postponing the right of visitation until the parent is in a position to exercise the right without interfering with the child's best interest. In so holding,

5

we are not establishing a hard and fast rule with regard to parents who are imprisoned under other circumstances.

## ISSUE 2

Did the District Court abuse its discretion when it ordered that, after his release from prison, the father's visitation will be supervised by maternal relatives?

The Romos argue that Robert's visitation should not be restricted. The proper standard to apply where the custodial parent seeks restriction of the noncustodial parent's visitation is the serious endangerment standard. Commissioners' Note to § 40-4-217, MCA. In applying this standard, the district court is vested with liberal discretion. *See Reininghaus*, 817 P.2d at 1161-62. In this case, there was substantial evidence in the record to support a finding of serious endangerment to the child's physical, mental, or moral well-being, including Robert's extensive previous drug use and chemical dependency, his dishonesty and antisocial behavior, his suicide attempts, and threats of violence. We conclude that the District Court did not abuse its discretion when it required that Robert's visitation be supervised.

However, the Romos argue that if supervision is necessary, that they should be allowed to supervise Robert's visitation with LaToya. In the alternative, they argue that § 40-4-218, MCA, requires the Department of Family Services to conduct supervised visitation.

6

The purpose behind § 40-4-218, MCA, is to provide court intervention where the custodial parent has made a decision regarding the child sufficient to endanger the child's physical health or emotional development, as for example, when a custodial parent refuses to provide medical care for a sick child. *See* Commissioners' Note to § 40-4-218, MCA. Although supervised visitation may be conducted by the Department of Family Services, *In re Marriage of Hickey* (1984), 213 Mont. 38, 689 P.2d 1222, visitation by a noncustodial parent may also be supervised by family members or other persons. The primary consideration in the selection of a person or persons to supervise visitation should always be the best interest of the child.

Tara testified that she objected to supervision of Robert's visitation with his daughter by Tom Romo and Connie Romo because they had failed to control Robert's behavior in the past. She also testified that Robert had threatened to take LaToya from her and believed that his parents would be unable to prevent him from removing the child from their supervision.

The guardian ad litem recommended that Robert's visitation be supervised by his parents. However, the District Court found that

> [t]he visitation recommendations made to the Court by Social Worker Pam Hodges are not based on competent and complete evidence. The visitation frequency and conditions recommended by Social Worker Hodges are not in the child's best interests.

7

We conclude that the District Court's findings with regard to supervised visitation are supported by substantial evidence. We also conclude that the manner in which the District Court ordered that visitation be supervised was not an abuse of discretion.

## ISSUE 3

Did the District Court err when it did not set a visitation schedule for the father after his release from prison, but merely provided that visitation would be permitted?

The Romos cite *Sanderson v. Sanderson* (1981), 191 Mont. 316, 623 P.2d 1388, to support their argument that it was an abuse of discretion not to set a specific visitation schedule. There, at the time the court awarded "reasonable visitation" to the father, the parties lived in the same city. Later, the mother moved 600 miles away, which effectively restricted the father's visitation. We did not find that the District Court abused its discretion, we merely remanded with directions that the District Court specify a reasonable schedule for visitation. *Sanderson*, 623 P.2d at 1389.

Moreover, we have previously held that failure to order a specific visitation schedule does not constitute an abuse of discretion where there is no need for specificity demonstrated and the record indicates a willingness to allow visitation. *In re Marriage of Meyer* (1983), 204 Mont. 177, 182-83, 663 P.2d 328, 331.

There is nothing in the record to suggest that the parties in this case will be unable to work out a reasonable visitation

8

schedule. The father's imprisonment at the time of the District Court's order, and the uncertainty with regard to his release, presented unique circumstances rendering a specific visitation schedule premature. We interpret the District Court order to provide for reasonable visitation, and we conclude that the District Court did not abuse its discretion when it granted reasonable visitation to Robert without further definition. We note, however, that should visitation become unworkable between the parties, the District Court may be required to devise a schedule. *In re Marriage of Dirnberger* (1989), 237 Mont. 398, 773 P.2d 330; *Sanderson*, 623 P.2d at 1389.

## ISSUE 4

Does the District Court order err by giving the mother absolute control over visitation by the paternal grandparents?

The order of the District Court states:

> While the child resides in Wolf Point, the grandparents may have visitation: a) once per week for a few hours each visit; b) for special occasions upon mutual agreement with the mother; and c) for "stop in" visits with her mother on holidays.

> When the mother and child relocate, the grandparents may have a) afternoon visits up to four times per month when the grandparents are able to travel to the place of residence; b) and holiday visits if prearranged and mutually agreed upon by the grandparents and child's mother.

> . . . .

> The parties' mutual agreement to visitation upon notice by the grandparents of their intent for visitation shall be a condition for visitation.

9

Further, Tara was ordered to notify Tom and Connie of her trips to Wolf Point so that visitation could be arranged, and advised that more frequent and longer visits, including overnight stays, would be permitted when the child is old enough to express her wishes to that effect.

The Romos argue that the District Court's order allows the mother to have absolute control over their visitation and does not grant them an independent right to visitation based on the permissive language "may" that appears in the order. They also argue that the condition of mutual agreement preceding each visitation weakens their right.

We interpret the references to the condition of mutual agreement to refer to times and places, not whether visitation may occur. As in any visitation situation, the success of this arrangement hinges on the cooperation of the parties. There is no evidence that cooperation has been withheld. When and if it is, the District Court is in the best position to make that determination and take the appropriate corrective measures.

Finally, Tara asks that she be awarded her attorney fees incurred on appeal. We conclude that the appeal is not groundless and we have no other factual or legal basis for awarding attorney fees.

The judgment of the District Court is affirmed.

_____
Justice

We concur:

_William E. Hunt Sr._

_Karla M. Gray_

_Fred J. Weber_

Justices

Justice John Conway Harrison, concurring in part and dissenting in part.

I concur and dissent from the majority opinion, particularly with issue 2: whether the District Court abused its discretion when it ordered that, after his release from prison, the father's visitation with the child would be supervised by a maternal relative. The parents of the father, the Romos, argue his visitation should not be restricted.

The record indicates that not only was the father a felon at the time of the hearing, but prior to that he had an unsavory record as a juvenile, including numerous incidents which would have been charged as felonies had he been older. The record also contains information that the father had been confined at the Miles City institute for juveniles and had threatened the mother of his child as well as her boyfriends. In addition, the record indicates the father has attempted suicide and has a history of violence.

Since the hearing, the mother has moved some 600 miles away from Wolf Point, Montana, and is now living in Pablo, Montana, with her mother and aunt. In objecting to the father's visitation in Pablo, it is quite understandable that the mother and aunt would not particularly welcome the father in their home while supervising him with the child. I would hold that the court did abuse its discretion when it required the father to have any visitation in Pablo.

After reading the record, I am troubled also that the father's and grandparents' interest in the child was not apparent until over a year after the child was born. The record indicates that no presents were ever given to the child until after this action was

12

commenced and no support was given to the mother who, it appears, was either 15 or 16 when the child was born. While the record is devoid of any reference as to where the mother and child received their financial support, it might well be that it had to have come either from the mother's parents or from welfare. To me, the sudden interest in the child a year after her birth and after the father was sent off to the penitentiary raises some question as to whether the child's best interest is served until the father establishes a record of non-violence.

Further, the record indicates that a clinical psychologist was hired to submit an evaluation of the appropriateness of the father's visitation with the child. The psychologist reported: "I see nothing contraindicatory [sic] about his having visitation with his child, be it in prison or not. Indeed, visitation rights would seem like a positive thing at this point." The psychologist arrived at this conclusion after telephone conversations with the father while in prison, yet he had never seen the father nor the mother or the child--I find it unusual that this recommendation would hinge on mere telephone conversations.

Finally, it is my view that if these visitations are to be carried out, I believe the mother's wishes and her situation--600 miles away from where most of this has occurred--be given more study. A period of time should pass allowing the child to grow before set periods of visitation by the father are allowed.

_____
Justice

13

March 28, 1994

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

MARY L. ZEMYAN
Attorney at Law
P.O. Box 1094
Wolf Point, MT 59201

CAROL C. JOHNS
Attorney at Law
P.O. Box 995
Wolf Point, MT 59201

LAURA CHRISTOFFERSEN
Attorney at Law
P. O. Box 997
Wolf Point, MT 59201

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
      Deputy